# United States Court of Appeals
## For the First Circuit
_____

Nos. 99-1577, 99-1578


UNITED STATES OF AMERICA,

Appellee,

v.

HERBERT DERMAN,

Defendant, Appellant.


_____


APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]


_____


Before

Selya, Boudin, and Lynch,
Circuit Judges.


_____


Richard M. Egbert, with whom Mary Ellen Kelleher was on brief, for appellant.
Ariane D. Vuono, Assistant U.S. Attorney, with whom Donald K. Stern, United States Attorney, and Shelbey Wright, Assistant U.S. Attorney, were on brief, for appellee.


_____


May 5, 2000

_____

**LYNCH, Circuit Judge**.  Herbert Derman, a lawyer, was charged with eight counts stemming from a marijuana-growing operation on the property of his weekend home along the  Massachusetts-New York border. A jury convicted Derman of two counts: conspiracy to manufacture, distribute, and possess with intent to manufacture and distribute marijuana, see 21 U.S.C. § 846, and criminal forfeiture, see 21 U.S.C. § 853.  Derman was sentenced to a term of 121 months in prison; five years of supervised release; a fine of $20,000; and forfeiture of his weekend home and property.  Derman appeals his conviction and sentence on four grounds: (1) claimed prosecutorial misconduct through a persistent appeal to class prejudice; (2) denial of his motion to suppress evidence obtained during searches of his properties; (3) failure of the court to offer and his trial counsel to request an opportunity for closing arguments on the forfeiture count; and (4) errors regarding the timing of his appeal of the forfeiture sentence. This last issue involves an important point of criminal procedure: we decide when an order of forfeiture, entered after the 1996 amendments to Rule 32, becomes final, thereby triggering the time for appeal.  We affirm the judgment and sentence.

## I.

Herbert Derman owned property, consisting of two parcels, that straddled the Massachusetts-New York border.  Derman, together with his wife, Barbara Derman, had a weekend home on the New York side, in the town of Hillsdale.  In 1983, Derman leased a portion of the property on the Massachusetts side, in the towns of North Egremont and

Alford, to Marcel Rosenzweig for the purpose of erecting a greenhouse. Rosenzweig erected the greenhouse in the spring of 1984. Above ground the new structure appeared to be a commercial greenhouse, below ground the space was designed for the greenhouse's true purpose: growing marijuana. Marijuana was grown in the underground location until September 1991 when Richard Haber, an indicted co-conspirator, was arrested at the site for possession of a small amount of marijuana. Though the underground operation was not discovered at this time, as a precautionary measure, the operation was moved to Rosenzweig's property in Sandisfield, Massachusetts, where it continued until it was exposed on August 17, 1995.

In December 1995, agents obtained and executed search warrants on Derman's New York City apartment, his New York City law office, his Hillsdale residence, his Massachusetts property, and his Vail, Colorado home. Eventually, Derman and six others, including Rosenzweig and Haber, were charged with various federal crimes relating to the marijuana-growing operation.[1]

In contrast to his indicted co-conspirators, who pled guilty

---

[1] In a superseding indictment dated October 1, 1996, a grand jury charged Derman with conspiracy to manufacture, distribute, and possess with intent to manufacture and distribute marijuana, see 21 U.S.C. § 846 (count one); manufacture and possession of marijuana with intent to distribute, see 21 U.S.C. § 841(a)(1) (count two); conspiracy to commit money laundering, see 18 U.S.C. § 371 (count five); money laundering and aiding and abetting, see 18 U.S.C. §§ 2, 1956(a)(1)(A)(i), 1956(a)(1)(B)(i) (counts six, eight, ten, and twelve); and criminal forfeiture, see 21 U.S.C. § 853 (count thirteen).

in accordance with plea agreements,[2] Derman decided to stand trial.  His principal defense was that he had no knowledge of the marijuana-growing operation on his property.  Derman's motion to suppress the evidence seized during the searches of his properties was denied on July 23, 1998.  See United States v. Derman, 23 F. Supp. 2d 95, 98 (D. Mass. 1998).  On July 29, 1998, a jury returned guilty verdicts on counts one and thirteen and not guilty verdicts on the remaining counts.  On the government's motion, the court, after issuing three stays to allow Derman time to file a brief, entered a preliminary order of forfeiture on November 6, 1998.  On December 15, 1998, Derman filed a motion for leave to file a late notice of appeal of the preliminary forfeiture order.  The court denied this motion on January 4, 1999.  Two days later, Derman filed another motion, which the court construed as a motion for reconsideration of the motion for leave to file a late notice of appeal.  On March 5, 1999, Derman was sentenced and on March 22, 1999, the court denied Derman's motion for reconsideration.  He now appeals.

## II.

Derman's appeal concentrates on the charge of prosecutorial misconduct through a persistent appeal to class prejudice.  His accusation focuses not only on statements by the prosecutor, the usual subject of misconduct allegations, but also on the government's trial

---

[2]      Save Rosenzweig, who died of cancer prior to trial.

strategy, which, Derman says, combined inappropriate prosecutorial statements with the introduction of class-biased evidence. Derman points, in particular, to nine instances during the trial:

1. the admission into evidence of a photograph of Barbara Derman in a ski outfit with mountains in the background and a witness's identification of Mrs. Derman in the photograph;

2. the questioning of Derman's secretary about "Derman's life-style back in the early 1970s when [she] began to work for him;"

3. the questioning of another secretary about Derman's property, possessions, and vacations;

4. the admission into evidence of a part of a videotape of Derman's Hillsdale home, which had been searched;

5. the admission into evidence of certain photographs from a photo album, as well as the cover page to the album, which was labeled "Special Memories" and which identified the locations photographed in the album, including some other than the locations in the admitted photographs;

6. the testimony of a Drug Enforcement Administration agent that the photo album contained photographs depicting all of the locations named in the "Special Memories" list;

7. the cross-examination of Barbara Derman regarding the locations identified in the "Special Memories" list;

8. the introduction into evidence of receipts from Cartier jewelers and another jeweler and the questioning of Barbara Derman regarding these items;

9. the references in the prosecutor's closing argument and rebuttal to vacations and jewelry and the statement that "if there is one thing that this case has shown[, it] is that the Dermans needed and wanted to get more money."

At trial, Derman objected to items 1,[3] 2, 3,[4] and 8 on various grounds and to items 4 and 5 on the basis of class bias. At trial, Derman did not make the allegation he now makes that the prosecution engaged in a course of conduct at trial that was based on class prejudice.

The government contends that the prosecutor's comments during the trial "focused directly on Derman's claim . . . that he had no motive, financial or otherwise, to engage in a drug conspiracy." Further, it says that "[e]vidence of Derman's lifestyle was specially relevant . . . to show how he used the proceeds." The government also contended at oral argument that Derman's attorney opened the door to this line of inquiry when he asked rhetorically in his opening argument, "where is the money?"

Courts have found prosecutorial misconduct for introducing class bias when prosecutors have engaged in actions that might inflame the passions of the jury to such an extent as to call into doubt the fairness of the trial. The Second Circuit, in United States v. Stahl, 616 F.2d 30 (2d Cir. 1980), reversed a judgment of conviction in a jury trial where the record indicated that the prosecutor "intend[ed] to arouse prejudice against the defendant because of his wealth and

---

[3]     Derman objected to the number of photographs the government sought to introduce; he agreed to the admission of the one photo of Mrs. Derman.

[4]     Derman objected to the characterization of the neighborhood of his New York City apartment as the "Upper East Side."

engaged in calculated and persistent efforts to arouse such prejudice throughout the trial . . . [and] made several statements . . . that were not supported by the evidence and may, in some instances, have been intentionally misleading." Id. at 32. Similarly, the Sixth Circuit, in Sizemore v. Fletcher, 921 F.2d 667 (6th Cir. 1990), upheld the issuance of a writ of habeas corpus in a case where the prosecutor "made repeated and deliberate statements clearly designed to inflame the jury and prejudice the rights of the accused, and the court [did] not offer[] appropriate admonishments to the jury." Id. at 670; see also Read v. United States, 42 F.2d 636, 645 (8th Cir. 1930) (reversing guilty verdict in misappropriation of funds case). As this court stated in United States v. Rothrock, 806 F.2d 318 (1st Cir. 1986), "[a]rgument, especially the government's, should not degenerate into an appeal to prejudice." Id. at 323.

That said, the line between statements that are "appeals to class prejudice [that] are highly improper and cannot be condoned" and statements regarding class that are "relevant to the issues at hand" is not easily drawn. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 239 (1940). It is especially difficult to draw when an accused's motivation is at issue, and when, as here, the alleged motivation is financial. Derman says that the government crossed the line and that

his conviction should be reversed and his sentence vacated.[5]

We have no need to worry about the remedy because there was no misconduct. The statements by the prosecutor, during the trial and during closing arguments, went to the motive for the alleged crimes and did not impermissibly stray into class bias. Derman's motive was not only essential to the government's case, but also crucial to the defense, as is evidenced by defense counsel's question, in his opening argument, "where is the money?," and by his statement, in his closing, "There is no money, they can't find any money."

Additionally, the district court judge was sensitive to the potential prejudicial effect of the evidence admitted.[6] With this in mind, he limited the introduction of the number of photographs of Barbara Derman, he restricted the extent to which the photo album could

---

[5]    If we were to find misconduct, the remedy of a new trial would not necessarily be in order. "The determination of whether prosecutorial misconduct has so poisoned the well that a new trial is required involves the weighing of several factors: (1) the severity of the misconduct; (2) the context in which it occurred; (3) whether the judge gave any curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant." United States v. Rodríguez-De Jesús, 202 F.3d 482, 485 (1st Cir. 2000) (internal quotation marks and citations omitted); see also United States v. Canas, 595 F.2d 73, 77-78 (1st Cir. 1979). In making this determination, we would "take a balanced view of the evidence in the record." Rodríguez-De Jesús, 202 F.3d at 485.

[6]    It might seem curious that item 1, a photograph of a woman in a ski outfit and sunglasses on a ski slope, was used to identify Barbara Derman. But defense counsel did not object to the photograph, much less object on the ground that the photograph would evoke class bias.

be used, and he curtailed the use of the videotape. Further, he made an offer to give a limiting instruction on some of the admitted evidence, an offer which the defense did not accept.

Finally, there is no indication, looking at the totality of the evidence admitted and the statements made by the prosecutor, that there was a trial strategy or course of conduct that, intentionally or unintentionally, would lead to the unlawful enkindling of class bias in the jury.

### III.

Derman also contests the denial of his motion to suppress. See Derman, 23 F. Supp. 2d at 102. He specifies three errors: (1) the warrants were not sufficiently particular; (2) the scope of the search at the law firm exceeded the authority of the warrant; and (3) the warrant was not provided to Derman's agent at his law office when requested.[7]

First, Derman alleges that the search warrants were insufficiently particular. "[T]here is no guidance whatsoever in the warrant[s]," he says, "to assist the executing officers in their determination of what items are authorized to be seized." He cites to four of the warrants' descriptions of items to be seized:

"5. All unprivileged documents in client files"

_____

[7] Derman does not challenge on appeal the probable cause determination underlying the warrants, as he did before the district court. See Derman, 23 F. Supp. 2d at 99.

-10-

relating to certain individuals and companies;

"6. All documents relating to any transaction between [the various alleged co-conspirators] identified in the . . . affidavit . . . including canceled checks, cashier's checks, money orders, invoices, contracts, agreements, correspondence, memoranda and photographs;"

"9. Letters and other documents reflecting communications between" Derman and others "and their criminal associates identified in the . . . affidavit;" and

"11. Address and phone books reflecting the names and addresses of associates identified in the . . . affidavit."

Derman asserts that "[t]he descriptions offer no assistance to the executing officers as to how to determine what items will fall within those categories." He finds especially problematic the instruction regarding privileged information.

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. We have used a two-pronged test to determine whether "the goods to be described [can] not be precisely described . . . : first, the degree to which the evidence presented to the magistrate establishes reason to believe that a large collection of similar contraband is present on the premises to be searched, and, second, the extent to which, in view of the possibilities, the warrant distinguishes, or provides the executing

agents with criteria for distinguishing, the [sought-after evidence] from the rest of an individual's possessions." United States v. Fuccillo, 808 F.2d 173, 176 (1st Cir. 1987) (first set of alterations in original) (internal quotation marks and citations omitted); see also United States v. Abrams, 615 F.2d 541, 544-46 (1st Cir. 1980); Montilla Records, Inc. v. Morales, 575 F.2d 324, 325 (1st Cir. 1978). Derman contends that the warrants issued in this case did not satisfy Fuccillo's second prong.

The particularity of the warrant and the breadth of the search (which we will discuss below) are matters that should be considered with special care in the context of a law office because of the pervasiveness there of privileged items. See Klitzman, Klitzman & Gallagher v. Krut, 744 F.2d 955, 959 (3d Cir. 1984); People v. Hearty, 644 P.2d 302, 313 (Colo. 1982) (en banc); see also Andresen v. Maryland, 427 U.S. 463, 466-69, 478-82 (1976) (allowing the search of a law office when the lawyer was a target of the investigation.); Law Offices of Bernard D. Morley, P.C. v. MacFarlane, 647 P.2d 1215, 1222-23 (Colo. 1982) (en banc) (same); cf. Hearty, 644 P.2d at 313 (applying rule where the attorney is not a subject of the investigation). But cf. O'Connor v. Johnson, 287 N.W.2d 400, 402, 405 (Minn. 1979) (instituting a rule against searches by warrant of law offices when the attorney is not a subject of an investigation).

In this case, the warrants provided sufficient criteria in

-12-

the list of "Items to be Seized" to distinguish the evidence sought from other materials, including privileged materials. Further, a memorandum directed to the agents, investigators, and attorneys participating in the search of the law office emphasized that "[c]lient files for persons or entities other than [Rosenzweig, Haber, and a realty company allegedly connected with the marijuana-growing operation] cannot be opened or seized pursuant to the warrant." Additionally, a "privilege team" composed of attorneys, separate from the team of searching agents, was on hand "to answer any legal questions which may arise during the search" and, following the gathering of evidence, to "conduct a thorough review of all items seized . . . and determine whether any of the seized items contain any privileged information."

Second, Derman asserts that the actual search of the law office was overbroad in scope. The district court found that the agents made a "cursory" review of all the files and dictation tapes. See Derman, 23 F. Supp. 2d at 102. Derman points to the affidavit of Aghavni Ellian, a secretary in Derman's law office, which states that the agents looked through "each and every" file, looked through documents, and took notes "and/or took the file[s] into Herbert Derman's office where other agents were stationed." We review the district court's findings of fact under the clearly erroneous standard. See United States v. Ferreras, 192 F.3d 5, 9 (1st Cir. 1999), cert.

-13-

<u>denied</u>, 120 S. Ct. 969 (2000).  The district court's finding that the agents made a cursory review of the files is not clearly erroneous. <u>Cf.</u> <u>Andresen</u>, 427 U.S. at 482 n.11 ("In searches for papers, . . . some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized.").

Third, Derman claims that the officers' failure to give Ellian a copy of the search warrant violates Federal Rule of Criminal Procedure 41(d) and justifies suppression.[8]  <u>See</u> <u>United States</u> v. <u>Gantt</u>, 194 F.3d 987, 1000-05 (9th Cir. 1999).  <u>But cf.</u> <u>United States</u> v. <u>Bonner</u>, 808 F.2d 864, 868-69 (1st Cir. 1986).  This argument has been waived.  Ellian's affidavit asserting that she was never served with the warrant was before the district court judge for the purpose of supporting Derman's claim that the search exceeded its scope, not for a Rule 41(d) claim.  The trial court did not consider Rule 41(d) in its decision, and neither do we.

## IV.

Derman raises several issues pertaining the forfeiture of the property, some of which pose the question of whether there is appellate

---

[8]     Rule 41(d) states in pertinent part:

The officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant . . . .

Fed. R. Crim. P. 41(d).

-14-

jurisdiction.  We start with the issue of jurisdiction.

Before Derman was sentenced, but after the guilty verdict, the court entered, on the government's unopposed motion, a "preliminary order of forfeiture."  Derman sought and was denied leave to file a late notice of appeal, then asked for and was denied reconsideration. Apparently, the district court took the view that the date of entry of the pre-sentence preliminary order of forfeiture triggered the running of the time to appeal.  Defense counsel says that that was unlikely, but, in an abundance of caution, he tried to appeal from the order. Thereafter, on March 5 (amended on March 9), 1999, the district court imposed judgment and sentence, including an order that the property be forfeited.  Derman promptly appealed the judgment, including the final order of forfeiture.

The issue of whether the district court abused its discretion in not permitting Derman an extension to file a notice from the preliminary order of forfeiture has been briefed.  It raises the question of which order -- the preliminary pre-sentence order or the final judgment order -- is the final order for purposes of appeal.

As amended in 1996, Federal Rule of Criminal Procedure 32(d)(2) states:

> If a verdict contains a finding that property is subject to a criminal forfeiture, . . . the court may enter a preliminary order of forfeiture after providing notice to the defendant and a reasonable opportunity to be heard on the timing and form of the order.  The order of forfeiture

-15-

shall authorize the Attorney General to seize the property subject to forfeiture, to conduct any discovery that the court considers proper to help identify, locate, or dispose of the property, and to begin proceedings consistent with any statutory requirements pertaining to ancillary hearings and the rights of third parties. At sentencing, a final order of forfeiture shall be made part of the sentence and included in the judgment. The court may include in the final order such conditions as may be reasonably necessary to preserve the value of the property pending any appeal.

Thus, the forfeiture order, as the government now concedes, is a part of the sentence, see Libretti v. United States, 516 U.S. 29, 38-39 (1995), and becomes final for purposes of appeal when the court issues its judgment.[9] See Fed. R. App. P. 4(b).

_____

[9] The case law regarding this issue can be confusing because of the varying usages of the term "preliminary order of forfeiture." Before the 1996 amendments, a court could issue a preliminary order of forfeiture at (or following) sentencing. The pre-1996 preliminary order was preliminary, however, only in the sense that the government's interest was not finalized until the court could evaluate ancillary third-party claims to the forfeited property; the preliminary order was final, and thus appealable, as to the defendant. See United States v. Pelullo, 178 F.3d 196, 202 (3d Cir. 1999); United States v. Bennett, 147 F.3d 912, 914 (9th Cir. 1998); United States v. Christunas, 126 F.3d 765, 767-68 (6th Cir. 1997); cf. United States v. Libretti, 38 F.3d 523, 527 (10th Cir. 1994), aff'd, 516 U.S. 29 (1995). If, before 1996, the government was concerned that a delay between verdict and sentencing might hamper recovery of the forfeited property, it could request a restraining order to maintain the status quo until sentencing. See Fed. R. Crim. P. 32, advisory committee's note to 32(d)(2), 1996 amendments; United States v. Alexander, 772 F. Supp. 440, 442 (D. Minn. 1990). To solve this problem, the 1996 amendments allowed a court to issue a "preliminary order" before sentencing. Because this preliminary order is issued before sentencing, it is different from the pre-1996 preliminary order: it is not final as to the defendant and thus not appealable. Cf. United States v. Coon, 187 F.3d 888, 901 (8th Cir. 1999), cert. denied, 120 S. Ct. 1417 (2000). The post-1996 preliminary order acts much like the pre-1996 restraining order. After the 1996 amendments, the forfeiture order entered at sentencing is called "final order of forfeiture," and it is this order

-16-

As a result, Derman has properly appealed from the final order of forfeiture contained in his sentence. Derman raises two sorts of objections to the forfeiture order itself. He attacks the order on grounds of "sufficiency, prosecutorial misconduct and Constitutional errors."[10] Derman, however, did not preserve this issue for appeal. We would normally review his claim for plain error. See United States v. Badeaux, 42 F.3d 245, 246 (5th Cir. 1994). But Derman's argument on this point, in his brief, is perfunctory and unaccompanied by developed argumentation and we consider it waived. See Romero v. Colegio de Abogados de Puerto Rico, 204 F.3d 291, 296 n.4 (1st Cir. 2000).

Derman also says he should have been given an opportunity to argue the forfeiture issue to the jury before it decided the forfeiture count. After the jury found Derman guilty on count one and not guilty on the other substantive counts, the judge instructed the jurors on the forfeiture count. The trial judge did not offer, nor did counsel request, additional argument. Derman now claims that it was error for the judge not to have offered counsel the opportunity to give closing

---

that is appealable. Thus, regardless of the name given to the order of forfeiture (preliminary or final), both before and after the 1996 amendments the key moment for determining finality for the purpose of appeal is sentencing. Of course, if the forfeiture order is entered after sentencing, the time for appeal runs from the date of the post-sentencing order.

[10]    In his brief, Derman characterizes this as an error of the jury verdict. As the discussion in the text suggests, the error complained of is more properly described as an error in the sentence.

argument on this count. Derman also claims that the failure of his trial counsel to request further argument on the forfeiture count constitutes ineffective assistance of counsel. Counsel, Derman claims, could have informed the jury of "the fact that there are two separate parcels [that make up Derman's property, i.e., a parcel in New York and a parcel in Massachusetts], and . . . [argued] that forfeiture of the entire two parcels was disproportionate to the defendant's crime."

Since Derman's counsel did not object to the lack of closing argument on forfeiture, we review for plain error. See United States v. DeLeon, 187 F.3d 60, 65 (1st Cir.), cert. denied, 120 S. Ct. 551 (1999). Thus, "before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, . . . (3) that affects substantial rights" and (4) that "seriously affects the fairness, integrity, or public reputation of judicial proceedings." Johnson v. United States, 520 U.S. 461, 466-67 (1997) (alterations in original) (internal quotation marks omitted).

The district court did not commit plain error by not offering counsel the opportunity to present arguments to the jury on the forfeiture count. While it may be error for a judge to deny counsel's request for argument on forfeiture, Derman's counsel made no such request. Cf. Herring v. New York, 422 U.S. 853, 862 (1975) ("In a criminal trial, which is in the end basically a factfinding process, no aspect of such advocacy could be more important than the opportunity

-18-

finally to marshal the evidence for each side before submission of the case to judgment."); United States v. Feldman, 853 F.2d 648, 662 (9th Cir. 1988) (holding that "trial courts should bifurcate forfeiture proceedings from ascertainment of guilt, requiring separate jury deliberations and allowing argument of counsel").  Even if we thought that the trial judge should have offered counsel additional argument on the forfeiture count, we would not be convinced that this failure would satisfy the third and fourth tests of the plain error doctrine.  There was sufficient evidence in the record to support the jury's finding and, as explained below, it is unclear what argument Derman's counsel could have made that would have altered the forfeiture verdict.

Derman's ineffective assistance of counsel argument also fails.  Usually, we will "not entertain an ineffective-assistance-of-counsel claim on direct appeal unless the record is sufficiently developed."  United States v. Martinez-Martinez, 69 F.3d 1215, 1225 (1st Cir. 1995).  The record is sufficiently developed here. See United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991).

In Natanel, we found that "trial counsel's decision to waive a separate closing statement [on a count that was to be sent to the jury separately] strikes us as a strategy choice . . . well within the range of professionally reasonable judgments."  Id. at 310 (alteration in original) (internal quotation marks omitted).  Counsel's decision in Natanel was deliberate.  See id. at 309.  In this case, however, it is

-19-

too much to assume, as the government asks us to, that Derman's counsel purposefully waived argument on the forfeiture count. There is little reason to think that this was true.

In Strickland v. Washington, the Supreme Court found that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984). A conviction will be overturned if (1) "counsel's performance was deficient," that is, "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) "the deficient performance prejudiced the defense," that is, "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

Even assuming trial counsel's performance was deficient, which we doubt, Derman has not demonstrated prejudice. The two arguments that Derman now asserts his erstwhile counsel should have made to the jury would have been irrelevant to its decision. The jury was only to answer the judge's question: "Was the property owned by defendant, Herbert Derman, specifically the real property, together with all improvements thereon, at 83 Whites Hill Road, Hillsdale, New York, North Egremont and Alford, Massachusetts, . . . used or intended

to be used in any manner or part to commit or to facilitate commission of violations of the narcotics laws?" The questions of whether all of Derman's property or just some parcels should have been subject to forfeiture, see United States v. Bieri, 21 F.3d 819, 824 (8th Cir. 1994) (holding that "tracts of real property subject to forfeiture under section 853 are defined by the instruments and documents that created the defendant's interest in the property") (internal quotation marks omitted); United States v. Smith, 966 F.2d 1045, 1053-54 (6th Cir. 1992) (same); United States v. Reynolds, 856 F.2d 675, 677 (4th Cir. 1988) (same for civil forfeiture), and whether the forfeiture was excessive, see Bieri, 21 F.3d at 824, were for the judge, not for the jury, to answer.

**V.**

For these reasons, the judgment is underline_affirmed.